# United States Court of Appeals
## For the First Circuit

No. 21-1862

UNITED STATES,

Appellee,

v.

HOWARD JOHN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Kayatta, Lynch, and Thompson,
Circuit Judges.

Samia Hossain for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom
Rachael S. Rollins, United States Attorney, was on brief, for
appellee.

February 3, 2023

**LYNCH**, <u>Circuit Judge</u>.  Howard John pleaded guilty to being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1), reserving his right to contest on appeal the district court's denial of his motion to suppress evidence that he possessed an AR-15 assault rifle and many rounds of ammunition.

In a thoughtful opinion, the district court rejected his Fourth Amendment claim because John had not shown an objectively reasonable privacy interest in the items seized from a case John had left in the home of Nichelle Brison, his former domestic partner, and their six-year-old son.  John no longer lived in the home and had been told by Brison that he was unwelcome, but returned there unannounced on November 10, 2018, without her permission to do so or her permission to have left the unlocked case with weapons there.  The police learned these facts when they responded to her call for help after John had entered, assaulted her, and left both her and the boy wounded.  The police retrieved the case, which had blood on it, from the kitchen table.  We reject John's three arguments that the ruling was error and affirm.  We agree with the district court that John had no objectively reasonable expectation of privacy in the contents of the case.

## I.  District Court Findings of Fact

We take the facts from the district court's findings in its February 1, 2021, memorandum and order denying John's motion to suppress, supplemented "with the addition of undisputed facts

- 2 -

drawn from the suppression hearing." United States v. Cruz-Mercedes, 945 F.3d 569, 571 (1st Cir. 2019) (quoting United States v. Hernandez-Mieses, 931 F.3d 134, 137 (1st Cir. 2019)). We note that John did not contest any of the district court's findings.

**A.**

Just after midnight on November 10, 2018, Somerville Police Officers Cleary, Ramirez, and Sousa responded to a domestic disturbance call made by Brison at 3 Wesley Park, Apartment #202, Somerville, Massachusetts. Officer Sousa noticed blood on the apartment's door and on the floor immediately outside the unit. He knocked on the door multiple times and announced himself as Somerville Police. The officers heard a male voice from inside the apartment, asking Officer Sousa to "hold on." Approximately a minute later, after further knocks and demands from the officers, John opened the door, his hand bleeding. Officers Sousa and Ramirez recognized John from a previous domestic disturbance call at the same address in June 2018 involving John and Brison, in which Officer Sousa had run John's criminal history and learned he had previous firearms offenses on his record. Officer Sousa asked John to step into the hallway; John complied.

While Officers Sousa and Cleary waited with John in the hallway and called for medical assistance, Officer Ramirez entered the apartment. Inside, Officer Ramirez found Brison and her six-

- 3 -

year-old son. Brison was bleeding from her face, and she stated that John had struck her face with his hand. The child was bleeding from his left hand. When Officer Ramirez asked the child about his injury, he pointed to John and said, "[H]e cut me." The child also said, without prompting: "He has a gun," referring to John. Officer Ramirez asked where the gun was located, and the child responded, "[O]n his back." Officer Ramirez signaled to his colleagues in the hallway to handcuff John. The officers frisked John and did not find a gun. They asked John if he had a license to carry a firearm, and he responded that he did not. They then arrested John for domestic assault and battery and took him to the police station. Around this time, Lieutenant deOliveira and other assistance arrived.

After John was taken to the police station, Officer Sousa entered the apartment and spoke with Brison. Brison explained that John had arrived unannounced at her apartment at approximately 11:30 PM, saying he was there to "gather some of his belongings." John and Brison argued over his unannounced visit because "he did not live there anymore." Brison reported that John slapped and choked her until their child "interceded." John then removed bags from the apartment, including a black backpack. John returned to the apartment. Brison called the police, but John hit the phone out of her hand and punched her in the mouth, so all the dispatcher could hear was "a male and female yelling and screaming" and the

- 4 -

female yelling "get off me" before the line went dead. Brison armed herself with a knife, which John grabbed from her, cutting himself in the process. Their son was cut and hurt while trying to intervene. The violence ended when a neighbor knocked on the door, and the police arrived soon thereafter. Brison told the officers that she did not own any firearms, and if there were any firearms in the apartment, they belonged to John.

Officer Sousa also spoke with Brison's six-year-old son, who said that he had seen a gun with something yellow on it in John's black backpack. The child also told Officer Ramirez that there was "a suitcase with guns" in the apartment.

Brison, according to Officer Sousa's report, "asked [the officers] to locate and remove any firearms in the apartment because of her concern for the safety of her young son and her own safety." She signed a form consenting to Lieutenant deOliveira and Officer Ramirez making "a complete search of the above described apartment." The officers then opened the black case that John had left on the kitchen table near the front door. Brison had never seen the black case before that night when she observed John pull the case out from underneath an armoire in her apartment. John produced no evidence that the case was locked or even had a lock. The black case was covered with "what appeared to be fresh blood," and contained the lower receiver of an AR-15 rifle, two magazines loaded with 30 rounds of 5.56mm ammunition,

three rifle scopes, two clips of 7.62mm ammunition, and other items.

Officers then searched John's car. The officers "believed that there was probable cause to believe that the rest of the rifle could be inside Mr. John's vehicle" based on the "the lower receiver of the rifle [found inside the case] . . . coupled with the fact that Mr. John had just removed a backpack from the apartment, and placed it in his vehicle." The child had also told police that the black backpack contained a gun. In the car's trunk, Officer Sousa found a black backpack. Inside the backpack was a yellow glove and the upper receiver and barrel of an AR-15 rifle.

The Officer in Charge that night searched the police database for the rifle's serial number and learned that it had been reported stolen in Kittery, Maine. The Kittery Police Department informed the Somerville police that other firearms remained missing from the same firearms burglary. Officer Cleary and his colleague then returned to Brison's apartment and, with her consent, performed a second search and found some loose 9mm ammunition but no additional firearms.

**B.**

Relying only on the Somerville police incident report and the police reports contained therein, John moved to suppress the evidence resulting from the search of his black case,

including, as fruit of an unlawful search, evidence from the subsequent search of his vehicle, the database query, the second residential search, and his custodial statement. John argued that Brison's consent to search the case was insufficient because she had acknowledged to the Somerville police that the case did not belong to her. John also argued that, if the evidence from the search of the case was suppressed, there would have been insufficient information to support probable cause for the subsequent search of his car. In a later filing supplementing the motion, John asserted that he had a subjective and objectively reasonable expectation of privacy in the black case because he had previously lived in Brison's apartment, kept the case private, and was in the process of removing it from the apartment.

The government filed an opposition to John's suppression motion, arguing that John failed to establish a reasonable expectation of privacy, and, alternatively, that the search was reasonable under the exigent circumstances, emergency aid, and plain view doctrines, and that suppression was not warranted pursuant to the inevitable discovery doctrine.

After holding a hearing, the district court denied John's suppression motion, concluding that John's expectation of privacy in his black case was not objectively reasonable "because his presence in the apartment at or near the time of the search was not legitimate. [John] entered an apartment he had no

permission to be in and assaulted the apartment's occupant." United States v. John, No. 1:19-cr-10068, 2021 WL 327472, at *5 (D. Mass. Feb. 1, 2021) (citation omitted). The district court also declined to suppress the evidence found later. John pleaded guilty, preserving his right to appeal the denial of his motion to suppress, and the district court sentenced him to time served and three years' supervised release. This timely appeal followed.

## II. Analysis

When reviewing a district court's denial of a motion to suppress, appellate courts "assess factual findings for clear error and evaluate legal issues de novo." United States v. Pimentel, 26 F.4th 86, 90 (1st Cir. 2022). "In assessing these legal conclusions, however, we also give appropriate weight to the inferences drawn by the district court and the on-scene officers, recognizing that they possess the advantage of immediacy and familiarity with the witnesses and events." Id. (quoting United States v. Tiru-Plaza, 766 F.3d 111, 115 (1st Cir. 2014)). We uphold a district court's denial of a motion to suppress "provided that any reasonable view of the evidence supports the decision." Id. (quoting United States v. Ferreras, 192 F.3d 5, 10 (1st Cir. 1999)).

The Fourth Amendment of the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

U.S. Const. amend. IV. "The Fourth Amendment generally requires that the government obtain a warrant based on probable cause before conducting a search." United States v. Moran, 944 F.3d 1, 4 (1st Cir. 2019) (quoting United States v. Hood, 920 F.3d 87, 90 (1st Cir. 2019)). "To prevail on a claim that a search or seizure violated the Fourth Amendment, a defendant must show as a threshold matter that [they] had a legitimate expectation of privacy in the place or item searched." United States v. Battle, 637 F.3d 44, 48 (1st Cir. 2011). To determine this, we administer a two-part test: "[F]irst, whether the defendant had an actual, subjective, expectation of privacy; and second, whether that expectation 'is one that society is prepared to recognize as objectively reasonable.'" Id. at 48-49 (quoting United States v. Rheault, 561 F.3d 55, 59 (1st Cir. 2009)). Factors relevant to this determination include:

> ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case. We look, in short, to whether or not the individual thought of the place (or the article) as a private one, and treated it as such. If the movant satisfies us on this score, we then look to whether or not the individual's expectation of confidentiality was justifiable under the attendant circumstances.

United States v. Aguirre, 839 F.2d 854, 856-57 (1st Cir. 1988) (citation omitted). We reach only whether John has shown that any expectation of privacy in the contents of the black case is one that society is prepared to recognize as objectively reasonable. It is his burden to make that showing. See United States v. Stokes, 829 F.3d 47, 51 (1st Cir. 2016).

John presents three arguments: (1) that the district court conflated John's expectation of privacy in Brison's apartment with his expectation of privacy in the black case; (2) that the district court's reliance on cases involving a third-party lien on a defendant's possessions was misplaced; and (3) that John can maintain a reasonable expectation of privacy in the black case even though it was left in a space where he did not have permission to be. We deal with them in the order presented and hold that John did not have an objectively reasonable expectation of privacy in the black case because he did not have permission to be in Brison's apartment, where he also did not have permission to store the black case.

**A.**

We reject John's argument that the district court "erroneously relied on cases that involved evidence lying in plain view in the home of another rather than the search of a closed container" and thus elided the distinction between John's black case and the apartment. The district court properly analyzed

John's relationship to the apartment and its occupants as relevant factors to its totality-of-the-circumstances analysis to determine whether John's expectation of privacy in the black case was objectively reasonable.

John is correct that <u>Battle</u> does not hold that police can open a case belonging to him merely because he had no expectation of privacy in the apartment where the case was found. In <u>Battle</u>, the gun was found in plain view on the floor beneath a couch, not in a closed case. 637 F.3d at 47. But the district court was clearly aware of this distinction. <u>See</u> <u>John</u>, 2021 WL 327472, at *6 ("The fact the case was a closed container makes this a closer call than <u>Battle</u> where the gun was found beneath the couch."). In any event, at least three other circuits have held that a person who left a bag in a home, in which the person had no right to be, lost any legitimate reasonable expectation that the bag would not be opened. <u>See</u> <u>United States</u> v. <u>Sawyer</u>, 929 F.3d 497, 499-50 (7th Cir. 2019); <u>United States</u> v. <u>Cortez-Dutrieville</u>, 743 F.3d 881, 885 (3d Cir. 2014); <u>United States</u> v. <u>Jackson</u>, 585 F.2d 653, 658-59 (4th Cir. 1978). Certainly the circumstances here provide no reason to distinguish those holdings. John left his case for a prolonged period without permission or agreement in a home in which he was entirely unwelcome and had no right to enter. He could not reasonably have expected that Brison or others at her request would not open the unlocked case, especially when

his own actions gave rise to Brison's fear that the contents of the case might pose a danger.

Here, as in Battle, John was a "trespasser," 637 F.3d at 49, who had no legitimate expectation of privacy "that society is prepared to recognize as reasonable," Sawyer, 929 F.3d at 500.

**B.**

We also reject John's argument that the district court erred in relying on "cases that found no reasonable expectation of privacy where a third party held a lien on the defendant's possessions." First, the district court did not rest its decision on these cases. See John, 2021 WL 327472, at *5. Second, it is inconsequential whether Brison had the equivalent of a lien over John's black case. See United States v. Lnu, 544 F.3d 361, 366-67 (1st Cir. 2008) (defendant lacked reasonable expectation of privacy in contents of storage unit in part because storage facility operator had lien on locker's contents); see also United States v. Rahme, 813 F.2d 31, 34 (2d Cir. 1987) (hotel guest lacked reasonable expectation of privacy in hotel room or "any articles therein of which the hotel lawfully takes possession" after the end of the rental period). Even if "[e]veryone involved knew that the case belonged to . . . John," the totality of the circumstances analysis still leads us to the same conclusion: John did not have an objectively reasonable expectation of privacy in the black case.

## C.

John's third argument is that, even though he did not have permission to be in Brison's apartment, he had an objectively reasonable expectation of privacy in the black case because he was the sole owner of the closed case, which he had hidden from view; he exerted control over the case and had not abandoned it; and he was in the process of removing his belongings from the premises. We disagree.

The "totality of the surrounding circumstances," Aguirre, 839 F.2d at 857 -- including that John no longer lived in the apartment; that he does not allege he had permission to be in Brison's apartment at the time he initially placed the case in her apartment; that he arrived at the apartment unannounced and without permission; that he assaulted Brison in an altercation that also left their six-year-old son injured; that he left the black case in plain view on the kitchen table; that both Brison and the child told police they worried that John had a firearm in the apartment; and that Brison made explicit that she did not want any firearms even if in bags where she and her son lived -- makes clear that John's expectation of privacy in the black case is not "one that society is prepared to recognize as objectively reasonable." Battle, 637 F.3d at 48-49 (quoting Rheault, 561 F.3d at 59).

On November 10, John "was no longer a welcomed guest in [Brison's] apartment, but instead was a trespasser who stayed

- 13 -

beyond his permitted visit." Id. at 49. Trespassers have no legitimate expectation of privacy "that society is prepared to recognize." Sawyer, 929 F.3d at 500 (citing Battle, 637 F.3d at 49); see also Cortez-Dutrieville, 743 F.3d at 885 (holding that defendant lacked reasonable expectation of privacy in overnight bag found in apartment he was visiting in violation of a protective order). This reasoning applies with equal force to the black case. John did not have an objectively reasonable expectation of privacy. See supra Section II.A.

We reject John's argument that this case is governed by cases holding that, in some circumstances, an individual can maintain an objectively reasonable expectation of privacy in a closed container located in a place where the individual does not have such an expectation. For example, this court in United States v. Moran held that the defendant had an objectively reasonable expectation of privacy in his black trash bags kept inside his sister's storage unit with her permission. 944 F.3d at 5 n.2. Moran is distinguishable for precisely the reason the government argues: there was no dispute that the defendant in Moran stored his closed containers in his sister's storage unit with permission, see id. at 3-4, whereas here John had none. John's invocation of United States v. Infante-Ruiz, 13 F.3d 498 (1st Cir. 1994), fails for the same reason. This court in Infante-Ruiz held that the defendant had an objectively reasonable expectation of

privacy in his briefcase located in another's car trunk. Id. at 501-02. Like in Moran, the defendant in Infante-Ruiz had permission to place his briefcase inside the car's trunk. See id. at 500-01. Here, John had no such permission to leave the black case in Brison's apartment.

Furthermore, John's situation is not akin to the late check-out cases that he cites. See United States v. Ramos, 12 F.3d 1019 (11th Cir. 1994); United States v. Owens, 782 F.2d 146 (10th Cir. 1986). In Ramos, the Eleventh Circuit found the defendant -- a long-term "tenant of record" in a condo -- had an objectively reasonable expectation of privacy in a closed container inside the condo that was searched just a few hours after check-out time. 12 F.3d at 1021, 1025-26. Owens involved a similar situation, in which the court found the defendant, a hotel guest, had an objectively reasonable expectation of privacy in his left-behind luggage that was searched shortly after check-out time. 782 F.2d at 148-50. John's situation is nothing like Ramos's or Owens's.

### III. Conclusion

For the foregoing reasons, we **AFFIRM** the district court's ruling denying John's motion to suppress the evidence in the black case and the later discovered evidence.